IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| VERONICA OKON, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-09-449 |
| | § | |
| HARRIS COUNTY HOSPITAL | § | |
| DISTRICT, | § | |
| | § | |
| Defendant. | § | |

**MEMORANDUM OPINION**

Pending before the court[1] is Defendant's Motion for Summary Judgment (Docket Entry No. 22). The court has considered the motion, all relevant filings, and the applicable law. For the reasons set forth below, the court **GRANTS** Defendant's motion.

**I.  Case Background**

Veronica Okon ("Plaintiff"), a black female,[2] brought this action against Harris County Hospital District ("Defendant") under 42 U.S.C. § 1981 ("Section 1981") and 42 U.S.C. § 1983 ("Section 1983") for race discrimination,[3] alleging that Defendant unlawfully

---

[1]   The parties consented to proceed before the undersigned magistrate judge for all proceedings, including trial and final judgment, pursuant to 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73.  Docket Entry No. 12.

[2]   Plaintiff's Second Amended Complaint ("Comp."), Docket Entry No. 14, p. 2.

[3]   Plaintiff makes no claim under Title VII, 42 U.S.C. § 2000e.  Comp. Docket Entry No. 14, p. 1.  Plaintiff's Equal Employment Opportunity Commission charge was untimely filed.  See Defendant's Reply in Opposition to Plaintiff's Response to Defendant's Motion for Summary Judgment ("Def. Reply"), Docket Entry No. 33, pp. 1-2.

terminated her.[4]

Plaintiff, a naturalized United States citizen born in Nigeria,[5] was terminated from her employment with Defendant on August 19, 2005.[6] At the time of her termination, she was employed full time as a staff pharmacist in the outpatient pharmacy, also called the ambulatory pharmacy department, at Ben Taub General Hospital ("BTGH").[7] Defendant is comprised of multiple hospitals within Harris County, including BTGH, Lyndon B. Johnson General Hospital ("LBJGH"), and Gulfgate Hospital ("Gulfgate"), among others.[8] In 1994, Plaintiff was hired by Defendant for part-time employment at BTGH as a "floater," i.e., a pharmacist who substitutes when full-time pharmacists are absent.[9] She became a full-time pharmacist in 1997[10] and worked the night shift, usually 11:00 p.m. to 7:00 a.m., until her termination in 2005.[11]

**A. Reduction in Force**

Defendant initiated Plaintiff's termination as a result of a

---

[4]    See generally Comp., Docket Entry No. 14.

[5]    Defendant's Motion For Summary Judgment ("Def. MSJ"), Docket Entry No. 22-1, Dep. of Plaintiff, pp. 22-23.

[6]    Id. at 50-51.

[7]    Id. at 33.

[8]    See id. at 43, 54

[9]    Id. at 29.

[10]    Id. at 31.

[11]    Id. at 38-39.

reduction in force ("RIF"). Defendant's RIF policy, titled "Permanent Reduction in the Work Force Due to Business Necessity," provided a streamlined process by which certain employees were selected for termination whenever it became financially or otherwise necessary to reduce the workforce.[12] The reasons behind Defendant's 2005 RIF included the need for reorganization and an overall reduction in services as a result of an anticipated decrease in funding.[13] A "Budget Reduction Plan" for the fiscal year 2006 indicates that Defendant sought to reduce its 2006 budget via the 2005 RIF by eliminating pharmacist positions and by increasing the number of pharmacy technicians, "resulting in significant savings in salary dollars given that pharmacists are paid triple that of technicians."[14] The RIF was applicable to all hospitals within the district, not just BTGH.[15] Not all pharmacists in each selected department were terminated, however; some were retained under the RIF policy.[16] Plaintiff's organizational unit, the ambulatory pharmacy department, was one of the departments selected for a reduction in personnel.[17]

---

[12]   Def. Reply, Docket Entry No. 33-1, RIF Policy pp. 32-4.

[13]   Id. at 34.

[14]   Def. Reply, Docket Entry No. 33-1, FY 06 Budget Reduc. Plan, p. 22.

[15]   Def. Reply, Docket Entry No. 33-1, Dep. of Smith, pp. 13-14.

[16]   Def. MSJ, Docket Entry No. 22-1, Dep. of Plaintiff, pp. 54-55.

[17]   Def. Reply, Docket Entry No. 33-1, Dep. of Smith, pp. 13-14.

Pursuant to the RIF, Defendant identified which job classifications or organizational units were subject to elimination; if less than all positions within the job classification or organizational unit were to be eliminated, a five-step process was used to select employees within the department for termination.[18]  Employees were to be terminated in the following order:

1. Applicants with pending job offers, including applicants for transfers;
2. Contract, agency or registry staff;
3. Employees who have been disciplined (suspended, demoted, or on probation) at least twice within the last 365 days;
4. All new hires and transferred employees within the 90-day probationary period;
5. Employees with the lowest grid scores within the job classification or organizational unit.[19]

In the event that two or more employees had the same grid score, retention preference was given based solely on length of service.[20]

At the time of her termination, Plaintiff was not a new job applicant; was not contract, agency, or registry staff; had not been disciplined in the previous 365 days;[21] and was not a new hire

_____

[18]   See Def. Reply, Docket Entry No. 33-1, p. 35.

[19]   Id.

[20]   Id.

[21]   Plaintiff was never suspended, demoted, or placed on probation; the only record of disciplinary action against Plaintiff was a "verbal counseling" form for violation of Defendant's Time and Attendance policy, see Plaintiff's Response to Defendant's Motion for Summary Judgement ("P. Resp."), Docket Entry No. 29-6, and Plaintiff's testimony that she received verbal counseling for not attending an interdepartmental test.  Def. MSJ, Docket Entry No. 22-1, Dep. of Plaintiff, p. 77.

or transferred employee within the ninety-day probationary period.[22]

## 1. Grid Score

According to the RIF policy, if the number of employees targeted for reduction had not been achieved after eliminating the first four categories of employees, employees with the lowest grid scores were eliminated until the target number was reached.[23] Defendant's RIF policy provided that grid scores were to be based on "[a]n evaluation of relevant factors such as job performance, qualifications, seniority and other pertinent specific criteria applicable to the position."[24]   The policy included a sample template, which could be modified by Defendant's Human Resources Department and used "to evaluate individuals [for termination] if all positions within a job classification or organizational unit are not eliminated."[25]   Titled "Staff Grid Assessment," the sample grid assessment contained four weighted factors ("Evaluation Score," "Years of Service," "Second Language," and "Special Skill") which combined to produce a total score, the "Grid Score."[26]

Defendant's records revealed that five weighted factors were assessed to determine employee grid scores for the 2005 RIF: "PFP

---

[22]     Def. MSJ, Docket Entry No. 22-1, Dep. of Plaintiff, pp. 32-33.

[23]     Def. Reply, Docket Entry No. 33-1,, p. 35.

[24]     Id. at 34.

[25]     Id.

[26]     Id. at 38-39.

Score," i.e., a three-year average of employee performance appraisals (a score given yearly by an employee's immediate supervisor); "Second Language," i.e., an ability to speak a second language; "Test Score," i.e., an employee's score on a "Special Skills Test;"[27] "Longevity," i.e., seniority; and "Flexibility," i.e., a willingness to transfer.[28]

## 2. Special Skills Test

Prior to her termination, Plaintiff, along with all of Defendant's other pharmacists, was given a Special Skills Test ("Skills Test").[29] Plaintiff's immediate supervisor, Carl Smith ("Smith"), described the Skills Test as a "staff development program that was put together by the department to enhance the clinical skills of pharmacists."[30] Although employees were required to pass the test, no pharmacist had been fired for failure to take the test or achieve a passing score.[31]

The Skills Test was first administered some time before May 2004, and Plaintiff failed to achieve a passing score at that

---

[27] Although it is unclear from deposition testimony, the records indicate that the Skills Test was one of the weighted factors used in Defendant's Grid Score calculation. See P. Resp., Docket Entry No. 29-25, p. 1; see also Def. Reply, Docket Entry No. 33-1, Dep. of Smith, pp. 25-29.

[28] P. Resp., Docket Entry No. 29-25, p. 1.

[29] Def. MSJ, Docket Entry No. 22-1, Dep. of Plaintiff, p. 73.

[30] Def. Reply, Docket Entry No. 33-1, Dep. of Smith, p. 25.

[31] Id. at 27-28.

time.[32]  Testing was again scheduled for July 2005.[33]  A week before
the July 2005 retest, Plaintiff arrived at work on a Wednesday and
was told that she would have to take the Skills Test the following
Wednesday.[34]  Plaintiff worked twelve-hour night shifts every day
that week, including Saturday and Sunday.[35]  Plaintiff called Karen
Ortlipp ("Ortlipp"),[36] Smith's supervisor,[37] to request two more days
to prepare for the test, because preparation for the Skills Test
involved becoming familiar with a substantial amount of reading
material.[38]  Ortlipp denied Plaintiff's request without explanation,
telling her "[a]ll I need is for you to show up—just show up over
there."[39]  After Plaintiff failed to appear for the test, she
received a "verbal counseling" from Ortlipp.[40]

On August 19, 2005, Plaintiff was called into the office of
Dr. Edward Stemley ("Stemley"), Administrative Director of

---

[32]   Def. Reply, Docket Entry No. 33-1, p. 12.

[33]   Id.

[34]   Def. MSJ, Docket Entry No. 22-1, Dep. of Plaintiff, p. 74.

[35]   Id. at 55-56, 76.  At the time, Plaintiff was working the night
shift from 7:00 p.m. to 7:00 a.m.  Id.

[36]   Plaintiff and Smith's depositions both record Ortlipp's name as
"Karen Otlip" or "Karen Orlip;" Defendant's records refer to her as "Karen
Ortlipp."

[37]   Def. MSJ, Docket Entry No. 22-1, Dep. of Plaintiff, p. 42.

[38]   Id. at 73-74.

[39]   Id.

[40]   Id. at 77-78.

Pharmacy, and was told that she was one of fourteen pharmacists who had been terminated pursuant to the RIF.[41]  Plaintiff was handed a package of materials explaining the RIF.[42]  This was the first time Plaintiff was made aware that there would be a RIF in the pharmacy department.[43]  Plaintiff testified that when she asked Stemley if her discharge had anything to do with her failure to take the Skills Test, Stemley replied, "Oh, no, the test had nothing to do with that."[44]  However, the record indicates that the Skills Test was a factor in the evaluation of employees for termination.[45]

## B. Plaintiff's Testimony Regarding Discrimination

### 1. Less-Qualified, Non-Black Employees Retained

Plaintiff testified that she believed her termination was discriminatory for several reasons.  First, three other pharmacists, two Asian females and one white male, were retained by Defendant despite being "less qualified."[46]  Plaintiff supported her contention by observing: "I've been with the system longer, and I know the rules and regulations."[47]

---

[41]     Id. at 50.

[42]     Id.

[43]     Id.

[44]     Id. at 83.

[45]     Although it is unclear from deposition testimony, the records indicate that the Skills Test was one of the weighted factors used in Defendant's Grid Score calculation.  See P. Resp., Docket Entry No. 29-25, p. 1; see also Def. Reply, Docket Entry No. 33-1, Dep. of Smith, pp. 25-29.

[46]     Def. MSJ, Docket Entry No. 22-1, Dep. of Plaintiff, pp. 62-64.

[47]     Id. at 62.

### a. Melanie Ung and Jeffrey Hardy

The record reveals that Melanie Ung ("Ung"), an Asian female, was hired March 21, 2005.[48]  Jeffrey Hardy ("Hardy"), a white male, was hired on March 7, 2005.[49]

Plaintiff described Ung and Hardy as new hires who, at the time of the RIF, were still within the probationary period.[50] Plaintiff testified that the probationary period was six months;[51] in contrast, the RIF policy indicated that it was ninety days.[52] A pharmacy employee data sheet, produced by Defendant, indicated that as of July 20, 2005, Ung had been employed by Defendant for 0.34 years and Hardy for 0.38 years—each barely beyond the ninety-day probationary period referenced in the RIF policy.[53] Defendant's Fiscal Year 2006 "Budget Reduction Plan" stated that the RIF process began in June and provided that Defendant should "identify and notify affected[] pharmacists and technicians of lay off June-August [2005]."[54]

At the time she gave her deposition testimony, Plaintiff was

---

[48]    Def. Reply, Docket Entry No. 33-1, p. 27.

[49]    Id. at 21.

[50]    Def. MSJ, Docket Entry No. 22-1, Dep. of Plaintiff, pp. 69-70.

[51]    Id. at 69.

[52]    Def. Reply, Docket Entry No. 33-1, RIF Policy, p. 35.

[53]    P. Resp., Docket Entry No. 29-13, pp. 1-5; Docket Entry No. 29-14.

[54]    Def. Reply, Docket Entry No. 33-1, p. 22.

not aware of Hardy or Ung's Grid Scores.[55]

### b. Susan Roy

Susan Roy ("Roy"), an Asian female, was hired on November 16, 2000.[56] Although employed by Defendant longer than Ung and Hardy, Roy had been employed for less time than Plaintiff.[57]

Roy was Plaintiff's partner at the BTGH pharmacy, working the night shift with Plaintiff on alternating weeks.[58] In fact, Plaintiff had interviewed Roy when she first applied for a position with Defendant and had recommended Roy to her supervisor.[59] After her termination, Plaintiff discovered that Roy had been retained and was working Plaintiff's former shift in the pharmacy at BTGH.[60] Plaintiff characterized the circumstances of Roy's retention, and her own termination, as a "discriminating act."[61]

Plaintiff had no knowledge of Roy's Grid Score at the time she provided her testimony.[62]

### 2. Unfair Treatment by Management

Plaintiff also testified that she had been discriminated

---

[55]   Def. MSJ, Docket Entry No. 22-1, Dep. of Plaintiff, pp. 70, 73.

[56]   P. Resp., Docket Entry No 29-17, Roy Perform. Appraisal Form.

[57]   See Def. Reply, Docket Entry No. 33-1, Hardy New Hire Info, p. 27; Ung New Hire Info, p. 21.

[58]   Def. MSJ, Docket Entry No. 22-1, Dep. of Plaintiff, pp. 48-49, 55.

[59]   Id. at 58.

[60]   Id. at 56-57.

[61]   Id. at 57.

[62]   Id. at 70, 73.

against by Defendant during her employment.[63]   In addition to the circumstances surrounding the scheduling of the Skills Test, Plaintiff points to other instances where she felt discriminated against by her supervisors.[64]

At some point prior to Plaintiff's termination, Defendant had transferred a particularly knowledgeable pharmacy technician who was working with Plaintiff and assigned him to work with Roy.[65] Plaintiff complains that this experienced technician was replaced by an inexperienced one who often made mistakes.[66]   Plaintiff objected to the transfer to Smith, who forwarded her email to Lisa Kivela ("Kivela"), the head supervisor of the ambulatory pharmacy department, who was superior to both Smith and Ortlipp.[67]   Kivela emailed Plaintiff, telling her to do her job and to stop complaining.[68]

Plaintiff then emailed Smith, responding to Kivela's charges, who again forwarded the email to Kivela.[69]   Plaintiff testified that an email response from Kivela to Smith suggested that he should

---

[63]   See generally Def. MSJ, Docket Entry No. 22-1, Dep. of Plaintiff.

[64]   See generally id.

[65]   Id. at 86-89.

[66]   Id. at 88.

[67]   Id. at 90.

[68]   Id. at 91.

[69]   Id.

11

fire Plaintiff if she continued to voice her objections.[70]  After
this incident, Plaintiff felt that Kivela and Ortlipp, who were
friends, began "building something" against her.[71]  Additionally,
Plaintiff described Ortlipp's attitude towards her as "not nice,"[72]
and mentioned that Kivela and Ortlipp frequently returned
Plaintiff's friendly hallway greetings with silence.[73]

Plaintiff testified that Kivela and Ortlipp treated her
differently than others, but when asked whether she was treated
differently because of her race or because she objected to the
removal of her favored technician, Plaintiff testified that "it
could be both."[74]  When asked again whether race was the motivation
behind Kivela and Ortlipp's attitude towards her, Plaintiff could
not identify her race as the primary factor.[75]

As additional evidence of discrimination by Defendant,
Plaintiff offers two instances where she was treated differently
than a non-black employee with respect to vacation time and the
Skills Test.  First, Plaintiff requested two weeks of vacation time
from Smith, assuming the request would be granted because she had

---

[70]    Id.

[71]    Id. at 91-92.

[72]    Id. at 103.

[73]    Id.

[74]    Id. at 92.

[75]    Id.

12

accumulated a substantial amount of paid vacation hours.[76]  She was only given one week off.[77]  In addition, Ortlipp, vis-á-vis Smith, required Plaintiff to find someone to cover her shift while she was on vacation.[78]  In contrast, Plaintiff testified that Shelly Chacko ("Chacko"), an Asian female, was given time off without having to find a replacement for her shift.[79]  Plaintiff stated that she was told to look for coverage because the night shift was harder to cover than the day shift; Chacko worked the day shift.[80]  Plaintiff, however, "was not satisfied with that reason."[81]

Second, Plaintiff also complained that Chacko was granted extra time to prepare for the Skills Test without any disciplinary action; Plaintiff alleges that Chacko was retained by Defendant under the RIF.[82]

## II. Summary Judgment Standard

Summary judgment is warranted when the evidence reveals that no genuine dispute exists regarding any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986);

---

[76]   <u>Id.</u> at 92-94.

[77]   <u>Id.</u> at 93.

[78]   <u>Id.</u> at 93-94.

[79]   <u>Id.</u> at 85, 94-95.

[80]   <u>Id.</u> at 95-96.

[81]   <u>Id.</u> at 96.

[82]   <u>Id.</u> at 85-86.

Brown v. City of Houston, Tex., 337 F.3d 539, 540-41 (5th Cir. 2003).  A material fact is a fact that is identified by applicable substantive law as critical to the outcome of the suit.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Ameristar Jet Charter, Inc. v. Signal Composites, Inc., 271 F.3d 624, 626 (5th Cir. 2001).  To be genuine, the dispute regarding a material fact must be supported by evidence such that a reasonable jury could resolve the issue in favor of either party.  Anderson, 477 U.S. at 250; TIG Ins. Co. v. Sedgwick James of Wash., 276 F.3d 754, 759 (5th Cir. 2002).

The movant must inform the court of the basis for the summary judgment motion and must point to relevant excerpts from pleadings, depositions, answers to interrogatories, admissions, or affidavits that demonstrate the absence of genuine factual issues.  Celotex Corp., 477 U.S. at 323; Topalian v. Ehrman, 954 F.2d 1125, 1131 (5th Cir. 1992).  If the moving party can show an absence of record evidence in support of one or more elements of the case for which the nonmoving party bears the burden, the movant will be entitled to summary judgment.  Celotex Corp., 477 U.S. at 322.  In response to a showing of lack of evidence, the party opposing summary judgment must go beyond the pleadings and proffer evidence that establishes each of the challenged elements of the case, demonstrating that genuine issues of material fact do exist which must be resolved at trial.  Id. at 324.

When considering the evidence, "[d]oubts are to be resolved in favor of the nonmoving party, and any reasonable inferences are to be drawn in favor of that party." Evans v. City of Houston, 246 F.3d 344, 348 (5th Cir. 2001); see also Boston Old Colony Ins. Co. v. Tiner Assocs. Inc., 288 F.3d 222, 227 (5th Cir. 2002). The court should not "weigh evidence, assess credibility, or determine the most reasonable inference to be drawn from the evidence." Honore v. Douglas, 833 F.2d 565, 567 (5th Cir. 1987).

However, the nonmoving party must show more than "some metaphysical doubt as to the material facts." Meinecke v. H & R Block of Houston, 66 F.3d 77, 81 (5th Cir. 1995). Conclusory allegations, unsubstantiated assertions, improbable inferences, unsupported speculation, or only a scintilla of evidence will not carry this burden. Brown, 337 F.3d at 541; Ramsey v. Henderson, 286 F.3d 264, 269 (5th Cir. 2002). The court must grant summary judgment if, after an adequate period of discovery, the nonmovant fails "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp., 477 U.S. at 322.

An employee's subjective belief that she was the victim of discrimination is insufficient to create an inference of discriminatory intent. Lawrence v. Univ. of Tex. Med. Branch at Galveston, 163 F.3d 309, 313 (5th Cir. 1999). The court will grant

15

summary judgment for the employer if the evidence, taken as a whole, would not allow a jury to infer that the reason for the adverse employment action, at least in part, was discriminatory. See Bennett v. Total Minatome Corp., 138 F.3d 1053, 1060 (5th Cir. 1998).

### III.  Analysis

Section 1981 provides an avenue of recourse for persons who experience racial discrimination in employment.  See 42 U.S.C. § 1981; Jones v. R.R. Donnelley & Sons Co., 541 U.S. 369, 383 (2004). Section 1981 claims are analyzed according to the legal principles applicable to cases brought under the Civil Rights Act of 1964 ("Title VII").  Patel v. Midland Mem'l Hosp. & Med. Ctr., 298 F.3d 333, 342 (5th Cir. 2002) (stating that the standards on summary judgment for discrimination claims are the same under 42 U.S.C. § 1983 as under Title VII); Foley v. Univ. of Houston Sys., 355 F.3d 333, 340 n.8 (5th Cir. 2003) (stating that same criteria applies to Title VII and 42 U.S.C. § 1983 retaliation claims).

The Fifth Circuit has held that the Eleventh Amendment does not apply to counties and similar municipal corporations.  Crane v. Texas, 759 F.2d 412, 415 (5th Cir.), amended in part on denial of rehearing, 766 F.2d 193 (5th Cir. 1985) (citing Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 124 n.34 (1984); Lake Country Estates, Inc. v. Tahoe Reg'l Planning Agency, 440 U.S. 391 (1979)).  Although Defendant is not entitled to raise Eleventh

Amendment immunity as a bar to Plaintiff's claim under Section 1981, other legal precedent requires a finding that Plaintiff may not bring a direct claim against Defendant pursuant to Section 1981.

In Jett v. Dallas Ind. Sch. Dist., 491 U.S. 701, 731-32 (1989), the Supreme Court held that Section 1981 did not provide a separate cause of action against local government entities. Instead, plaintiffs were to pursue their rights under Section 1981 pursuant to Section 1983. Id. at 735. As the Fifth Circuit has noted, this is a significant difference; although respondeat superior liability may be available in a direct action under Section 1981, it is not available in a Section 1983 action. Felton v. Polles, 315 F.3d 470, 482 (5th Cir. 2002).

Under Monell v. New York Department of Social Services, 436 U.S. 658 (1978), a local government may only be sued under Section 1983 when the injury has been inflicted by the execution of its official policy. "Municipal liability under both Section 1981 and Section 1983 requires proof of three elements in addition to the underlying claim of a violation of rights: 'a policymaker; an official policy; and a violation of constitutional rights whose moving force is the policy or custom.'" Cox v. City of Dallas, 430 F.3d 734, 748 (5th Cir. 2005) (quoting Piotrowski v. City of Houston, 237 F.3d 567, 578 (5th Cir. 2001)). "An 'official policy' is either a policy statement, ordinance, regulation, etc., that has

been officially adopted by a policymaker, or a persistent, widespread practice of officials or employees, which although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents the municipality's policy." Id. (citing Cozzo v. Tangipahoa Parish Council, 279 F.3d 273, 289 (5th Cir. 2002)). Actual or constructive knowledge of such custom must be attributable to the governing body of the municipality or to an official to whom that body had delegated policy-making authority. Pineda v. City of Houston, 291 F.3d 325, 328 (5th Cir. 2002).

The court first turns to whether there was a violation of Plaintiff's constitutional rights before addressing Defendant's potential liability pursuant to Section 1983.

**A. Violation of Plaintiff's Rights**

**1. Plaintiff's Prima Facie Case for Race Discrimination**

The same evidentiary standards applicable to claims of race discrimination under Title VII, 42 U.S.C. § 2000e, also apply to claims under Section 1981. Raggs v. Miss. Power & Light Co., 278 F.3d 463, 468 (5th Cir. 2002). To establish a prima facie case of race discrimination, a plaintiff must demonstrate that she: (1) is a member of a protected class; (2) is qualified for the position at issue; (3) suffered an adverse employment action; and (4) was treated less favorably than similarly situated individuals who were not members of her protected class. Okoye v. Univ. of Tex. Houston

18

<u>Health Sci. Ctr.</u>, 245 F.3d 507, 512-13 (5th Cir. 2001) (addressing race discrimination claim).  "To establish a prima facie case, a plaintiff need only make a very minimal showing." <u>Thornbrough v. Columbus & Greenville R.R. Co.</u>, 760 F.2d 633, 639 (5th Cir. 1985).

Proof of disparate treatment can establish the plaintiff's prima facie case at step four. <u>Okoye</u>, 245 F.3d at 513; <u>see</u> <u>Bryant v. Compass Group USA Inc.</u>, 413 F.3d 471, 478 (5th Cir. 2005) ("To raise an inference of discrimination, the plaintiff may compare [her] treatment to that of nearly identical, similarly situated individuals.")  Additionally, the Fifth Circuit has held that, in an RIF case, the plaintiff, at step four, must provide "'evidence, circumstantial or direct, from which a factfinder might reasonably conclude that the employer intended to discriminate in reaching the decision at issue.'" <u>Nichols v. Loral Vought Sys. Corp.</u>, 81 F.3d 38 (5th Cir. 1996) (quoting <u>Amburgey v. Corhart Refractories Corp., Inc.</u>, 936 F.2d 805, 812 (5th Cir. 1991)).

Defendant argues that Plaintiff has not met her prima facie burden, asserting that Plaintiff has not offered sufficient proof that she was qualified for the position at issue.[83]  Additionally, Defendant contends that Ung and Hardy are not similarly situated with respect to Plaintiff's prima facie case.[84]  The court will discuss each argument in turn.

---

[83]    Def. Rep., Docket Entry No. 33, p. 5.

[84]    <u>Id.</u> at 9-11.

19

### a. Qualified for the Position at Issue

In support of its contention with respect to Plaintiff's qualifications for the position, Defendant asserts that Plaintiff produced no evidence demonstrating that she ever received a passing score on the Skills Test, stating that "[Plaintiff's] non-passing score and refusal to take the Clinical Skills Assessment Test when administered to all of the other staff pharmacists is evidence that she was not qualified to remain in a pharmacist position."[85]   The court does not agree that Plaintiff's test scores and failure to take the test when administered render her unqualified for the pharmacist position.

According to Smith's testimony, the Skills Test was developed by Defendant's pharmacy department in an effort to enhance the clinical skills of its pharmacists.[86]   Smith also testified that, to his knowledge, no pharmacist had ever been terminated for failure to take or pass the Skills Test.[87]   Moreover, Defendant produced no evidence that potential hires were required to take and pass the test.

It is readily apparent that the Skills Test is a form of continuing education, designed to assess the skills and abilities of Defendant's employees.   The evidence does not show that the test

---

[85]     Id. at 5-6.

[86]     Def. Reply., Docket Entry No. 33-1, Dep. of Smith, p. 25.

[87]     Id. at 28.

was a device by which Defendant determined whether pharmacists were qualified for continued employment.  If the Skills Test were truly a litmus test used by Defendant to determine whether an individual was qualified to work as a pharmacist, job applicants would be required to take and pass it as part of the hiring process.

Although the Skills Test does bear on the issue of whether Plaintiff's proffered comparables, i.e., similarly situated individuals, were retained under "nearly identical" circumstances, it does not affect whether Plaintiff met the minimum qualifications for her position.  See, e.g., Coleman v. Exxon Chem. Corp., 162 F. Supp. 2d 593, 608 (S.D. Tex. 2001).  Therefore, Plaintiff's failure to pass the Skills Test does not indicate that she is unqualified to remain a pharmacist.  Accordingly, the court finds, for prima facie purposes, that Plaintiff was qualified for the position at issue.

### b. Similarly Situated

Defendant asserts that Plaintiff has not satisfied her prima facie burden with respect to the fourth element of her cause because she failed to prove that Hardy and Ung were similarly situated individuals.  Defendant apparently concedes that Roy is similarly situated with respect to Plaintiff for purposes of her prima facie case.  The court addresses this fourth prong of Plaintiff's prima facie case with respect to Hardy and Ung.

### i. Hardy

21

Defendant contends that Hardy is not similarly situated to Plaintiff because he was hired as a Pharmacy Operations Manager, while Plaintiff was a staff pharmacist.[88]  Defendant maintains that pharmacy operations managers were not subject to the 2005 RIF and were not required to take the Skills Test.[89]

The record confirms that Hardy was hired into the pharmacy department as a Pharmacy Operations Manager, a position with different responsibilities than Plaintiff's.[90]   Most notably, Hardy's ultimate supervisor was not Kivela, Director of Pharmacy, Ambulatory Services (the ultimate supervisor of Ung, Roy, and Plaintiff), but Ryan Roux, Director of Pharmacy, Inpatient Services.[91]   The RIF applied only to staff pharmacists and not Pharmacy Department managers.[92]

Thus, Plaintiff has not presented sufficient evidence to establish that Hardy was a similarly situated individual.

### ii. Ung

Defendant contends that Ung was not similarly situated to Plaintiff because she was not employed at BTGH, did not work the

---

[88]   Def. Reply., Docket Entry No. 33, p. 9.

[89]   <u>Id.</u>

[90]   Def. Reply., Docket Entry No. 33-1, Hardy Empl. Info. Sheet, p. 21.

[91]   <u>Id.</u>

[92]   Def. Reply., Docket Entry No. 33-1, Dep. of Smith, pp. 13-14.

night shift, and did not share the same supervisor as Plaintiff.[93]
Defendant also observes that, although the RIF impacted the entire
ambulatory pharmacy department at Defendant's three hospitals, the
overall goal of the RIF, as indicated by Defendant's Fiscal Year
2006 "Budget Reduction Plan," was to reduce full-time night shift
positions at BTGH (where Plaintiff worked) and LBJGH, because these
emergency room pharmacies were slated for closure.[94]  Additionally,
Defendant maintains that none of the positions at the Gulfgate
pharmacy (where Ung worked) were eliminated in the 2005 RIF.[95]
However, as discussed below, there is sufficient evidence to raise
a fact issue that Ung and Plaintiff were similarly situated.

The "FY [2006] Budget Reduction Plan" indicated that BTGH and
LBJGH pharmacies were slated for closure and specifically
contemplated meeting its 2006 budgetary goals by undertaking a
"reduction in night shift hours for the BTGH and LBJGH emergency
room pharmacies."[96]  However, nothing in the record indicates that
the reduction in hours at these locations had to be accomplished
only by terminating BTGH and LBJGH emergency room pharmacists; the
plan actually provided for the transfer of pharmacists to

---

[93]    Def. Reply., Docket Entry No. 33, p. 10.

[94]    Id.

[95]    Id.

[96]    Def. Reply., Docket Entry No. 33-1, FY 06 Budget Reduc. Plan, p. 22.

pharmacies heavily affected by layoffs under the RIF procedures.[97]

Furthermore, Smith testified that the RIF applied to all pharmacists within Defendant's ambulatory pharmacy department, which included the Gulfgate pharmacy.[98]   Even if none of the positions at Ung's work location were eliminated during the RIF, those pharmacists were still subject to the same department-wide RIF as those at BTGH and LBJGH.

Defendant directs the court to Coleman v. Exxon Chemical Corporation, 162 F. Supp. 2d 593 (S.D. Tex. 2001), in support of its contention that Ung is not similarly situated to Plaintiff.[99] The Coleman court held that "[w]here the comparator and the [p]laintiff have different supervisors, their situations are not 'nearly identical.'"  Id. at 613 (citing Okoye).  Defendant argues that Ung's immediate supervisor at Gulfgate was not Smith (Plaintiff's supervisor), and therefore Ung's and Plaintiff's positions were distinguishable.[100]

The court in Coleman, however, did not consider the same-supervisor requirement at the prima facie stage of analysis, instead reserving that discussion for its later McDonell Douglas pretext/mixed-motive analysis.  Id. at 609 ("The [c]ourt's analysis

_____

[97]   Id.

[98]   Def. Reply., Docket Entry No. 33-1, Dep. of Smith, pp. 13-14.

[99]   See Def. Reply., Docket Entry No. 33, pp. 9-10.

[100]   Smith was the Pharmacy Supervisor at only BTGH, not Gulfgate.  See Def. Reply., Docket Entry No. 33-1, Dep. of Smith, p. 8.

on the second and third steps of the McDon[nell] Douglas test resolves this case. Thus, the Court assumes for the summary judgment motions that Plaintiffs have met their prima facie burden.").

Moreover, the Fifth Circuit has held that, for the purposes of an employee's proffered comparator, "it is sufficient that the ultimate decisionmaker as to employees' continued employment is the same individual, even if the employees do not share an immediate supervisor." Lee v. Kan. City S. Ry. Co., 574 F.3d 253, 260-1 (5th Cir. 2009). Although Ung and Plaintiff have different immediate supervisors, Defendant's organizational chart reveals that Ortlipp and Kivela also supervised the Gulfgate pharmacy, in addition to BTGH and LBJGH.[101] Therefore, Ung and Plaintiff shared the same ultimate decision maker(s) with respect to their employment with Defendant.

The court finds that because Plaintiff and Ung, as members of Defendant's ambulatory pharmacy department, were subject to the same RIF and had the same ultimate supervisor(s), they are similarly situated for the purposes of Plaintiff's prima facie case. Thus, Plaintiff has met her burden of establishing her prima facie case.

## 2. **McDonell Douglas** Analysis

Because Plaintiff has met her prima facie burden, the court

---

[101]     P. Resp., Docket Entry No 29-32, Pharm. Dept. Org. Chart.

must continue the analysis for Plaintiff's race discrimination claim. In the absence of direct evidence, of which Plaintiff admittedly has none,[102] the well-established burden-shifting approach first adopted in McDonnell Douglas, 411 U.S. at 802, and modified in Desert Palace, Inc. v. Costa, 539 U.S. 90 (2003), and Rachid v. Jack in the Box, Inc., 376 F.3d 305 (5th Cir. 2004), applies to claims brought under Title VII. A plaintiff's prima facie case creates an inference of discrimination that shifts the burden of production to the defendant to come forward with evidence that the adverse employment action was taken for a legitimate, nondiscriminatory reason. Okoye, 245 F.3d at 513. The burden is one of production, not persuasion, and "can involve no credibility assessment." Reeves v. Sanderson Plumbing Prods., 530 U.S. 133, 142 (2000). Once the employer articulates a legitimate nondiscriminatory reason and produces competent summary judgment evidence in support of it, the inference created by the prima facie case drops out of the picture. Russell v. McKinney Hosp. Venture, 235 F.3d 219, 222 (5th Cir. 2000).

Defendant, then, must produce evidence that the adverse employment action was taken for a legitimate, nondiscriminatory reason. Okoye, 245 F.3d at 513. Defendant has not produced such evidence.

The stated purpose of Defendant's RIF policy was to "establish

---

[102]    P. Resp., Docket Entry No. 29, p. 4.

26

the guidelines for permanent reductions in positions due to a business necessity, including reorganization, anticipated decrease in funding, and reductions in services."[103]   Defendant's policy appears to establish objective criteria by which employees are evaluated for termination in the event that such action becomes financially or otherwise necessary.[104]   Additionally, the Fifth Circuit has held that termination of an employee pursuant to an RIF is presumably legitimate.   See E.E.O.C. v. Tex. Instruments Inc., 100 F.3d 1173, 1181 (5th Cir. 1996) ("[A] reduction in force . . . is itself a legitimate, nondiscriminatory reason for discharge.").

In the present case, Defendant only argues that Roy had a higher Grid Score than Plaintiff, thus justifying Roy's retention and Plaintiff's termination pursuant to its race-neutral RIF policy.[105]   However, Defendant fails to make any argument concerning Plaintiff's other comparator, Ung.   Ung had a lower Grid Score than Plaintiff[106] and yet was retained, an apparent violation of the RIF policy.   Defendant has failed to explain its decision-makers' rationale for terminating Plaintiff and not Ung.

Thus, as Defendant has failed to produce evidence of a legitimate, non-discriminatory reason for Plaintiff's termination,

---

[103]   Def. Reply., Docket Entry No. 33-1, RIF Policy, p. 34.

[104]   See generally Def. Reply., Docket Entry No. 33-1, RIF Policy.

[105]   Def. Reply., Docket Entry No. 33, p. 11.

[106]   P. Resp., Docket Entry No. 29-28, Grid Analysis.

the court terminates its <u>McDonnell Douglas</u> analysis.

**B. Official Policy of Policymaker as Driving Force**

Having determined that Plaintiff has raised a fact issue that Defendant violated Section 1981, the court turns to the next aspect of a Section 1983 action, whether the violation was made pursuant to a municipal policy or custom.

While Plaintiff concedes that Defendant's RIF policy is neutral on its face, Plaintiff argues that Defendant's "unofficial policy and practice" of not applying the RIF procedures consistently resulted in the deprivation of Plaintiff's rights. Plaintiff further argues that even if the court were to conclude that the deprivation of Plaintiff's rights pursuant to this practice was primarily carried out by Defendant's employees, the official policymaker, i.e., Defendant's Board of Directors (the "Board"), was nonetheless the moving force behind the violation because "the Board placed its stamp of approval on the deprivation."[107]

Plaintiff offers no testimony or other record evidence indicating that the Board tacitly approved or was even aware of any practice of deviating from the RIF policy. The only evidence offered by Plaintiff to this end is her assertion that "the Board approved the final cuts and reductions."[108]  However, the testimony

---

[107]    P. Resp., Docket Entry No. 29, p. 29.

[108]    P. Resp., Docket Entry No. 29, p. 24.

of Plaintiff and Smith, and the internal documents produced by Defendant, reveal nothing about the Board's decision-making process concerning the RIF policy, much less any contemplation that the RIF procedures were being manipulated or ignored.   Thus, no actual knowledge of the alleged custom or practice asserted by Plaintiff may be attributed to Defendant's final policymaker.

In the absence of actual knowledge attributable to the Defendant's final policymaker, Plaintiff charges the Board with constructive knowledge of the alleged deprivation, mentioning Paz v. Weir, 137 F. Supp. 2d 782, 799 (S.D. Tex. 2001), among other cases, for the proposition that actions of employees may prove a policy or custom for which the municipality is liable.[109]   However, the Paz court cautioned that, in order for a municipality to be charged with constructive knowledge of an act based on the acts of its employees,   "'those actions must have occurred for so long or so frequently that the course of conduct warrants the attribution to the governing body of knowledge that the objectionable conduct is the expected, accepted practice of city employees.'"   Id. at 798-9 (quoting Webster v. City of Houston, 735 F.2d 838, 842 (5th Cir. 1984)).   The decision in Paz underscores that, "[c]onsistent with the commonly understood meaning of custom, proof of random acts or isolated incidents is not sufficient to show the existence of a custom or policy." Id. at 799.

---

[109]     P. Resp., Docket Entry No. 29, pp. 22-3.

Plaintiff is correct that Defendant may not be insulated from liability simply because the violation was carried out by Defendant's lower level department supervisors. However, the record does not reveal evidence of frequent or longstanding manipulation of the RIF policy in order to discriminate against employees. In fact, although the RIF policy was established in 2000, there is no indication that the policy was ever administered except in 2005. Plaintiff has provided no other instances, aside from the 2005 RIF, where Defendant's RIF policy was applied, much less deviated from.

The circumstances surrounding Defendant's 2005 RIF alone cannot serve as the basis for attributing to the Board constructive knowledge that the objectionable conduct in question was the accepted practice of Defendant's employees. With respect to Defendant's deviation from its race-neutral RIF policy that resulted in Plaintiff's termination, there is simply no record evidence that it was a persistent, widespread practice that was so common and well settled as to constitute a custom that fairly represents Defendant's policy. Thus, Plaintiff cannot meet the requisite elements of a Section 1983 action and, therefore, her claim of race discrimination against Defendant must fail.

Accordingly, the court **GRANTS** Defendant's motion with respect to Plaintiff's Section 1981 claim.

## IV. Conclusion

Based on the foregoing, the court **GRANTS** Defendant's Motion for Summary Judgment (Docket Entry No. 22).

SIGNED in Houston, Texas, this 4th day of August, 2010.

Nancy K. Johnson
United States Magistrate Judge